**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-13-0005212**
**30-NOV-2015**
**09:13 AM**

NO. CAAP-13-0005212


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
CHARLY HERNANE, also known as CHARLIE HERNANE,
Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-0699)


MEMORANDUM OPINION
(By:  Foley, Presiding Judge, Fujise and Reifurth, JJ.)

In this prosecution for the offense of Murder in the
Second Degree, Defendant-Appellant Charly Hernane (Hernane)
appeals from the judgment and argues for a new trial based on the
improper argument of the trial prosecutor.

I.

On the late evening of May 10 or early morning hours of
May 11, 2011, the decedent, Hernane's adoptive mother (Mother),
was attacked and killed with a knife[1] in a bedroom that she
shared with Hernane.  Mother's body was found in the morning of
May 11, 2011.  Later that morning, Honolulu Police Department
(HPD) officers arrested Hernane in the nearby Kalihi District
Park, next to the Kalākaua Gym.  HPD officers testified that
Hernane had blood splattered on his shirt and appeared groggy.
Of the three blood samples taken from the shirt Hernane was
wearing at the time of his arrest, one sample came solely from

---

[1]     Medical Examiner Dr. Kanthi De Alwis (Dr. De Alwis) later
testified that Mother died due to a combination of a stab wound to the neck
and a hemorrhagic stroke at the time of the stabbing.  Dr. De Alwis could not
determine which of the two caused Mother's death because either one could have
been fatal.

Mother and the two other samples contained a mixture of blood from at least two individuals, with the "major contributor" of the mix coming from Mother.

On May 18, 2011, the State of Hawai'i (State) indicted Hernane for Murder in the Second Degree, a violation of Hawaii Revised Statutes (HRS) §§ 707-701.5 (2014)[2] and 706-656(2) (2014).[3]  The case was tried before a jury on August 5, 2013 through August 9, 2013,[4] who found Hernane guilty as charged.

## II.

On appeal, Hernane argues that the deputy prosecutor, Darrell Wong, (DPA) committed prosecutorial misconduct during closing argument when he (1) orally modified the Circuit Court's instructions to the jury on state of mind; (2) improperly

---

[2]  HRS § 707-701.5 reads now, as it did in 2011,

> **[§ 707-701.5]  Murder in the second degree.**  (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>
> (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[3]  HRS § 706-656(2) reads now, as it did in 2011,

> **§ 706-656 Terms of imprisonment for first and second degree murder and attempted first and second degree murder.**
>
> . . . .
>
> (2) Except as provided in section 706-657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706-606.5 shall serve at least the applicable mandatory minimum term of imprisonment.
>
> If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706-657, as part of that sentence, the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706-606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

[4]  The Honorable Rom A. Trader presided.

appealed to the jurors' emotions by using an inflammatory power point slide; and (3) issued an illegal "Allen charge."

## A.

Hernane argues that the DPA committed prosecutorial misconduct when he orally modified the Circuit Court's instruction to the jury on definitions related to states of mind for the commission of Murder in the Second Degree because he equated the statutory language, "intentionally" and "conscious object," with "desire to kill."

This court has held that "[p]rosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. Carvalho, 106 Hawai'i 13, 16 n.7, 100 P.3d 607, 610 n.7 (App. 2004) (citation and internal quotation marks omitted). "To determine whether reversal is required under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 52(a) because of improper remarks by a prosecutor which could affect Defendant's right to a fair trial, we apply the harmless beyond a reasonable doubt standard of review." State v. Sanchez, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App. 1996) (citation, internal quotation marks, and brackets omitted). That standard of review requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996). In assessing whether prosecutorial misconduct warrants a new trial, the Hawai'i Supreme Court has set forth three factors to consider: "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." State v. Pacheco, 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001).

1.   DPA's Comments on State of Mind.

During his August 9, 2013 closing argument, the DPA addressed the state of mind for murder as follows:

> Let's talk about state of mind. I believe it is instruction number seven that tells you that there are two types of evidence -- direct evidence, such as testimony of a witness and those who have actual knowledge of a fact and circumstantial evidence. The state of mind -- this is on page 15 -- may be proved. What a person is thinking at the time he commits a crime or commits an act which constitutes

a crime may be proved by circumstantial evidence. There can be no eyewitness account of what somebody's thinking. A person can even tell you what he's thinking, but that may or may not necessarily be the truth. You have to decide whether that witness is credible. But, in any case, the state of mind which acts are done or omitted or which a person fails to do may or not -- may or may not indicate the state of mind with which he does or refrains from doing an act. What does that mean? You've heard the phrase "actions speaks louder than words." When you want to determine what someone is thinking, what's going on in his mind, look at what he does. What actions does he engage in? That will be a fair indication of what he's thinking, and that is the way that the state of minds are proved.

Now, in this particular case, what is the defendant guilty of? You need to ask yourself first when you consider the evidence: Did the defendant, one, have a desire to kill; or two, was he aware that using this knife in the manner that he did -- as the medical examiner had told you, most likely in a face to face situation. She couldn't tell you whether they were both standing up or if she was lying down, but it was more likely face to face as he -- as he used this weapon upon -- on his mother, his adoptive mother rather than from behind. It was face to face. So you ask yourself: Was he aware that engaging in that conduct, stabbing in the neck was practically certain to cause the death of [Mother]? If you can answer either one of those, whether he had a desire to kill -- and as we've discussed earlier, how long does it take to form an intent to do anything?

[DEFENSE COUNSEL]: Your Honor, I have an objection to make.

[CIRCUIT COURT]: All right. At the bench.

(The following proceedings held at the bench:)

[CIRCUIT COURT]: Your objection.

[DEFENSE COUNSEL]: I think the prosecutor is using the word "desire", misstates the law with regard to have an intentional state of mind, or misstates what the law says and ask for a correction to --

[DPA]: Hold on. As I -- I believe there is case law that makes reference to the description of an intentional state of mind as having the desire.

[CIRCUIT COURT]: Do you have the cite?

[DPA]: What was that?

[CIRCUIT COURT]: Do you have the cite?

[DPA]: No, I don't, Your Honor.

[CIRCUIT COURT]: All right.

[DPA]: But --

[DEFENSE COUNSEL]: I just think it's confusing because the jury has a definition, and they should rely on what's in the definition.

[DPA]: Well, my argument is that conscious object to cause a result is a desire.

> [CIRCUIT COURT]: All right. I will overrule the objection. Certainly either side may make appropriate arguments, but ultimately the jurors have to follow the instructions that were provided to them and to the extent that they construe any arguments made by you or remarks to be inconsistent with these instructions they're also instructed on page 1 to disregard. I don't find that the argument made thus far knows that form, and so with that the objection's overruled.
>
> (Bench conference concluded.)
>
> [DPA]: Okay. So as you ask the questions: Did the defendant have a desire to kill, or was he aware that his conduct was practically certain to cause the death of [Mother]? If you find that either of those states of minds have been satisfied, then you must find the defendant guilty of Murder.
>
> . . . .
>
> . . . A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result. His conscious object, which I term as basically he has that desire to engage in that conduct, a desire to kill someone. That desire, that intent can come upon someone in a second's notice just as you make a spontaneous decision to do whatever you do. If somebody angers you and you punch 'em in the face, it is your conscious object to engage in that conduct.

In his closing argument, counsel for Hernane responded,

> Now, you have your instructions on the law and you're going to be able to deliberate and apply the law as given to you. On page 16, it talks about state of mind, and it states a person is not guilty of an offense unless the State proves beyond a reasonable doubt that the person acted with a required state of mind. And, again, the state of mind we're talking about in this case is an intentional or knowing state of mind.
>
> 'Intentional' is also defined on page 24. <u>And [DPA] talks about someone having a desire, okay? Intentional, plain and simple. It means somebody meant to do it. It was their purpose.</u> It was their conscious object to cause a result, and the result we're dealing with in this case is death. In other words, in order to have an intentional state of mind, you have to have meant to cause death in this case.

(Emphasis added.)

Hernane argues that the DPA committed prosecutorial misconduct when he orally modified the Circuit Court's instruction to the jury on definitions related to states of mind for the commission of Murder in the Second Degree because he equated the statutory language, "intentionally" and "conscious object," with "desire to kill." Hernane bases his argument entirely upon the recent opinion of the Supreme Court of Hawai'i in <u>State v. Basham</u>, 132 Hawai'i 97, 319 P.3d 1105 (2014).

5

In Basham, the defendant argued on appeal that the State committed prosecutorial misconduct when, during closing argument, the prosecutor misstated the law on accomplice liability, thereby reducing the culpability necessary to establish the statutory definition of an accomplice. Basham, 132 Hawaiʻi at 108-09, 319 P.3d at 1116-17. Justice Pollack, writing for the majority, explained at length the problems with either party orally altering jury instructions.

> Neither party should be permitted to argue during closing arguments for alternative definitions of terms in the jury instructions that best fits their own theory of the case. If such arguments were permitted, then either side could orally amend the court's instructions during closing argument by providing their own popular definitions of key terms in the instructions. The jurors would then be able to select the definition they preferred or remembered when applying the court's instructions during deliberations. Such a practice would be especially problematic if it involved critical instructions that are key to the State's theory of prosecution, as the accomplice instruction was in this case.

> It is precisely to avoid such confusion that the rules provide a specific procedure for the court, rather than the counsel or the parties, to instruct the jury on the law. Hawaiʻi Rules of Penal Procedure (HRPP) Rule 30(b) (2012) provides that parties "shall file written requests that the court instruct the jury on the law." When a request is filed, counsel is "entitled to be heard thereon." HRPP Rule 30(c). "The court may revise the language of any or all of the requested instructions which are approved by the court in whole or in part[.]" HRPP Rule 30(d). The court is required to "inform counsel of its proposed action with respect to any such revision made or instructions prepared by the court, and any changes thereon made by the court shall be reduced to writing and submitted to counsel prior to their arguments to the jury." HRPP Rule 30(d). Jury instructions that are settled as set forth above "shall be read to the jury." HRPP Rule 30(d).

> The rules prohibit oral amendments to the jury instructions once they have been given to the jury. HRPP Rule 30(e) provides that the court "shall in no case orally qualify, modify or explain to the jury any instruction . . . ." (Emphasis added). When the jury requests further instruction during deliberation on its verdict, the court may provide further instructions, but the instructions must be "reduced to writing" and "first submit[ted]" to counsel. HRPP Rule 30(e).

> In this case, the above procedures were followed by the parties until the prosecutor orally modified the court's accomplice instruction by defining the words "promote" and "facilitate." The prosecutor did not submit a written request for such definitions, despite submitting four other proposed instructions related to accomplice liability. The prosecutor also did not object to the lack of such definitions during the settling of jury instructions, which occurred just before closing arguments. Thus, neither the court nor defense counsel had approved of defining "promote" as "to encourage" and "facilitate" as "to make easy."

Id. at 109-10, 319 P.3d at 1117-18.

6

In response, relying on <u>State v. Pinero</u>, 70 Haw. 509, 522 n.7, 778 P.2d 704, 713 n.7 (1989), the State argues that "[t]here is no meaningful difference between having the 'intent' or 'conscious object' with respect to one's conduct and the result of one's conduct and having the 'desire' with respect to the same." By implication, the State also appears to argue that, unlike in <u>Basham</u> where the Court held that the orally modified instruction "reduced the culpability required by HRS § 702-222[,]" <u>Basham</u>, 132 Hawai'i at 110, 319 P.3d at 1118, the oral modification in the instant case did not meaningfully affect the culpability required by HRS § 707-701.5 and otherwise was harmless beyond a reasonable doubt.

In <u>Pinero</u>, in deciding whether the trial court's manslaughter instruction was correct, the Hawai'i Supreme Court noted with apparent approval[5] the following analysis of the Model Penal Code's formulation of the four states of mind.

> Modern penal codes have consistently followed the lead of the Model Penal Code by utilizing only four culpable mental states and by defining them in a substantially similar way.
>
> The basic distinction between a person who acts "purposely" ("intentionally") and one who acts "knowingly" is that the former actor <u>desires</u> to engage in given conduct (which happens to amount to a crime) or <u>desires</u> by his conduct to cause a prohibited harmful result, while the latter actor is merely <u>aware</u> that he is engaging in given conduct (which happens to amount to a crime) or is <u>aware</u> that it is practically certain that his conduct will cause a prohibited harmful result.
>
> The difference between the terms "recklessly" and "negligently", as usually defined, is one of kind, rather than of degree. Each actor creates a <u>risk</u> of harm. The reckless actor is <u>aware</u> of the risk and disregards it; the negligent actor is <u>not aware</u> of the risk but should have been aware of it.

<u>Pinero</u>, 70 Haw. at 522 n.7, 778 P.2d at 713 n.7 (1989) (emphasis added) (quoting 1 C.E. Torcia, Wharton's Criminal Law § 27, at 140 (14th ed. 1978)). <u>See also</u>, Commentary on HRS § 702-206 (2014) ("The difference between acting intentionally according to subsection (1), and knowingly, according to subsection (2), is narrow but nonetheless distinct. The distinction lies in the

---

[5] The second and third paragraphs quoted below were repeated in the court's headnotes 10 and 11, 70 Haw. at 511, 778 P.2d at 707, supporting the notion that it approved of this language.

fact that intent is characterized by a conscious object to engage in certain conduct or cause a certain result whereas knowledge is characterized by an awareness that conduct is of a certain type or that a certain result will almost certainly obtain.") Thus, while the DPA here arguably "explained" the intentional state of mind, unlike the argument in Basham, his explanation was an accurate statement of the law and did not modify the instruction in such a way as to reduce the culpability necessary to satisfy the statutory definition of "intentional" conduct.[6] Thus, we conclude that, the DPA did not violate HRPP Rule 30 and did not commit misconduct. State v. Meyer, 99 Hawai'i 168, 171, 53 P.3d 307, 310 (App. 2002) quoting State v. Lincoln, 3 Haw. App. 107, 125, 643 P.2d 807, 820 (1982) ("Since we find that the [prosecutor's] comments were not improper, we need not address the question as to whether the [jury] instruction cured the problem that would have been created by an improper comment." (Footnote omitted.)).

2.   DPA's Power Point Slide.

Hernane objected to the DPA's PowerPoint Slide #4, which contained the caption "No good deed goes unnoticed" above a photograph of Mother's body.

> [DEFENSE COUNSEL]: Well, you know, the photo -- the slide in question is a photograph of the decedent. And above the photograph in large blue letters is the phrase "no good deed goes unnoticed." Now, my interpretation of this is this is a comment, a sarcastic comment on the case and that the decedent adopted [Hernane], took him in, cared for him, and in return he kills her. And I think this is an improper argument. If anything, it's designed to inflame the jury and appeal to their passion or emotion which is strictly prohibited, you know, in having them use that to decide the case. So I think it's unnecessary and improper and there's a danger that it will inflame the jury.
>
> [CIRCUIT COURT]: All right. [DPA], I'll hear your response.
>
> [DPA]: Only, Your Honor, you know, that this is the state of the evidence, and the State intends to make that argument that, yes, she -- Ms. -- the complainant in this case did adopt him and as a re -- I mean, and this is what happened. It's -- it is what it is, and that's all I'm arguing --
>
> [CIRCUIT COURT]: All right.

---

[6]   Similarly, we note that Hernane's counsel's argument explained the intentional state of mind ("It means somebody meant to do it. It was their purpose.") in terms that did not change its meaning.

[DPA]: -- circumstances of the case --

[CIRCUIT COURT]: All right.

[DPA]: -- but this is argument and I would --

[CIRCUIT COURT]: All right, the objection is duly noted as well as the response. At this point this is closing argument. And, given that, there's a fair amount of latitude that the court allows to both sides in making arguments that appropriately comment upon the evidence. And this particular slide, the phrase that appears at the top of the slide is not in quotation marks. It was not part of the record. However, if you make it clear, [DPA], that this is not intended as a quote from the evidence and that it's simply so that that danger does not exist, then I will permit it, all right?

During his closing argument, the DPA stated that Mother's "death sentence" was her "reward" for adopting Hernane.

[DPA]: The thing is [Mother], as you've heard from the evidence, adopted [Hernane] at a very young age. She basically did a good deed. And you've heard the term "no good deed goes unnoticed." Unfortunately, in this case, her good deed turned into something very, at this point, noticeable but a punishment for her. It was her death sentence. She had every intent to take in [Hernane], to support him as a young child in the Philippines, moved to Hawaii and was -- when she was capable of caring for him then, brought him over to Hawaii. Although he went back to the Philippines for a while, he came back. And she continued to care for him. And this was her reward.

[CIRCUIT COURT]: [DPA], can you please clarify that phrase at the top of the screen, please.

[DPA]: "No good deed goes unnoticed." We would like to think that when we do good things that there are rewards for our good deeds. In this case, there probably was along the way, but in the end there was no reward for [Mother].

[DEFENSE COUNSEL]: Your Honor, I would object.

[CIRCUIT COURT]: May I see counsel at the bench.

(The following proceedings held at the bench:)

[CIRCUIT COURT]: All right, at this point would you like to fully state your objection?

[DEFENSE COUNSEL]: Well, Your Honor, I think, clearly, [DPA] is trying to appeal to their passion and prejudice at this point. The court has made it clear that [DPA] was to clarify that the words are not quotes from the decedent and he has failed to clarify that.

[CIRCUIT COURT]: [DPA], at this point I interjected because it was clear based upon my rule relative to the defendant's objection I ruled the objection that it would necessarily require to clarify to ensure the jurors to understand that this is simply a characterization and it is not intended as to the reference as to any evidence in the case, specifically. And so with that, I will overrule the objection subject to you clarifying that, but I suggest you also move on.

[DPA]: Okay. I'm sorry. An explanation that this is not a characterization of the evidence?

[CIRCUIT COURT]: No, in other words, it is not intended to be a reference to any specific evidence, namely, a quote that was introduced.

[DPA]: Okay.

[CIRCUIT COURT]: So subject to your making that clarification so that it's clear that the jurors will not misconstrue that, then I will overrule the objection, all right?

[DPA]: Okay.

(Bench conference concluded.)

[CIRCUIT COURT]: Proceed.

[DPA]: Okay. Just to clarify. This "no good deed goes unnoticed" is not intended by the State to comment on the evidence itself. There's been no evidence testimony that says no good deed goes unnoticed. It is pure argument on the State's part and is not intended to comment on the evidence, okay?

Hernane argues, "the DPA's Power Point slide and its corresponding argument that appealed to the passions and prejudices of the jurors constituted prosecutorial misconduct." Hernane asserts that "the DPA made blatant appeals to the jurors' emotions and expressed his personal opinion on [Hernane's] and [Mother's] characters" when (1) he displayed the caption accompanying an image of Mother's body and (2) he "snidely argued that [Mother's] death was her 'reward' for taking in [Hernane] as a young child and supporting and caring for him."

The State argues that "it cannot be said conclusively that the prosecutor was appealing to the jury's sympathy. Indeed, during his closing argument the prosecutor specifically reminded the jury that it was not to base its decision in the case on passion, prejudice, or sympathy."

a.    The Nature of the Conduct.

In State v. Rogan, 91 Hawai'i 405, 412-13, 984 P.2d 1231, 1238-39 (1999), the Supreme Court of Hawai'i discussed the function of the prosecutor in closing argument.

This court has repeatedly noted that "[t]he prosecution has a duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." [State v.] Quitog, 85 Hawai'i [128,] 136 n.19, 938 P.2d [559,] 567 n.19 [(1997)] (quoting State v. Moriwaki, 71 Haw. 347, 354, 791 P.2d 392, 396 (1990) (citations and internal quotation marks omitted)); State v.

Pemberton, 71 Haw. 466, 476, 796 P.2d 80, 85 (1990). The American Bar Association (ABA) Prosecution Function Standard 3-1.2(c) (3d ed. 1993) states that "[t]he duty of the prosecutor is to seek justice, not merely to convict."

With regard to the prosecution's closing argument, a prosecutor is "permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." Quitog, 85 Hawaiʻi at 145, 938 P.2d at 576 (quoting State v. Clark, 83 Hawaiʻi 289, 304, 926 P.2d 194, 209, reconsideration denied, 83 Hawaiʻi 545, 928 P.2d 39 (1996) (citations omitted)). In other words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom. Quitog, 85 Hawaiʻi at 145, 938 P.2d at 576. In this regard, ABA Prosecution Function Standard 3-5.8(a) (1993) states:

"In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw." The commentary on Standard 3-5.8 aptly emphasizes:

The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.

Rogan at 412-13, 984 P.2d at 1238-39. Quite simply, "prosecutors 'should not use arguments calculated to inflame the passions or prejudices of the jury.'" Id. at 413, 984 P.2d at 1239 (quoting ABA Prosecution Function Standard 3-5.8(c) (3d ed. 1993)).

In Rogan, the court held that, in a sexual assault case, the prosecutor's comment that it is "every mother's nightmare to find some black, military guy on top of your daughter" constituted an impermissible appeal to racial prejudice. Id. at 412, 984 P.2d at 1238 (brackets and ellipsis omitted). In the instant case, the DPA's caption does not fall neatly into a prohibited category of comment.

Arguments that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated. Of course, the mere mention of the status of the accused as shown by the record may not be improper if it has a legitimate bearing on some issue in the

case, such as identification by race. <u>But where the jury's predisposition against some particular segment of society is exploited to stigmatize the accused</u> or the accused witnesses, such argument clearly trespasses the bounds of reasonable inference of fair comment on the evidence. Accordingly, many courts have denounced such appeals to prejudice as inconsistent with the requirement that the defendant be judged solely on the evidence.

<u>Id.</u> at 413, 984 P.2d at 1239 (quoting ABA Prosecution Function Standard 3-5.8(c) (3d ed.1993)) (emphasis added). <u>See also</u>, <u>State v. Mars</u>, 116 Hawai'i 125, 143, 170 P.3d 861, 879 (App. 2007) (concluding that the "prosecutor's remark about '[t]his community is measured by how we treat its weakest members' was improper, since it appeared to invite the jury to base its verdict on considerations other than the evidence in the case.")

Here, the caption, "No good deed goes unnoticed" was not relevant to any issue at trial, and could have been reasonably interpreted as an invitation to the jury to base its decision on considerations other than the evidence in the case. The DPA's caption is an obvious misquote of the common saying, "No good deed goes unpunished." It is inconceivable that the DPA did not know or consider this; moreover, the caption would trigger any reasonable juror's memory of the correct adage. The clear message conveyed by the DPA's misquote is that Hernane "punished" Mother. In fact, the DPA followed up by stating that, "Unfortunately, in this case, her good deed turned into something very, at this point, noticeable but a punishment for her." The DPA's comment plays upon the notion that children "owe" their parents, and that an adopted child should be especially grateful. Neither idea was relevant to a fact in dispute at trial.

Moreover, these comments also amount to unreasonable inferences not drawn from evidence. It is uncontested, as the State argued, that Mother adopted and cared for Hernane, that is to say, performed a "good deed." The State also presented strong circumstantial evidence that Hernane killed Mother with a butcher knife. However, as the DPA also argued in his closing arguments, "we'll never know why this happened" and, while the prosecution need not prove motive for the crime, motive can be relevant to state of mind and Hernane's state of mind was very much at issue at trial.

### b.  The Promptness of a Curative Instruction.

The Circuit Court overruled Hernane's objection to the slide and therefore no curative instruction was issued.

The State asserts that the Circuit Court's instructions prior to closing argument telling jurors not to be influenced by passion or prejudice[7] sufficed to cure any potential prejudicial effect of the power point slide because "[a]s a rule, juries are presumed to . . . follow all of the trial court's instructions. State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1333, 1142 (1996)." Taking this assertion to its logical extreme, the prejudice caused by any improper argument could be eradicated by the trial court's general instruction to disregard such remarks. This is not the law in this jurisdiction. Moreover, a curative instruction requires specificity and necessarily comes after the improper comments. See State v. Marsh, 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986) (vacating conviction and noting circuit court's failure to issue specific instruction concerning prosecutor's closing comments).

This factor therefore weighs heavily in Hernane's favor. See, e.g., State v. Wakisaka, 102 Hawai'i 504, 516, 78 P.3d 317, 329 (2003) ("Generally, we consider a curative instruction sufficient to cure prosecutorial misconduct because we presume that the jury heeds the court's instruction to disregard improper prosecution comments. However, no curative instruction was given in this case. Therefore, this second factor weighs heavily in [defendant's] favor.") (citation omitted).

### c.  The strength or weakness of the evidence.

Although the case as a whole against Hernane was relatively strong, evidence of the state of mind element was the weakest part of the State's case. Hernane asserts that "the seminal issue in this case was whether [Hernane] possessed the requisite state of mind (intentionally) for commission of the

---

[7]     The Circuit Court instructed,

> Statements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence.

offense." Hernane presented no evidence. The State's evidence included testimony from family members that Hernane was adopted by Mother before she came to Hawai'i in 1997; they lived in a house shared with Mother's sister-in-law and family; Hernane was quiet and "never" spoke with people in the house and was "always in the room" he shared with Mother; and at the time of her death, Mother was sick and on dialysis. On May 10, 2011, Hernane was seen around midnight smoking outside on the back steps of the house.

A neighbor reported that, at midnight on May 10, 2011, he heard a man arguing in Filipino and English, coming from some other house. Later, he heard a "boom;" something dropping on the plywood floor.

Mother was discovered the following morning lying face-down on her bed with "sharp force injuries" and no vital signs. There was blood on the bed sheets and a butcher knife on the floor. The butcher knife was usually kept in a kitchen drawer. Blood on the butcher knife was later found to be that of Mother.

Mother sustained "an incised wound [] to the lower part of the left earlobe, [] that extended from the face to the lower part of the earlobe to the back . . . a stab wound also to the left neck . . . another small incision to the left back of the neck as well as the shoulder[.]" She also had two small cuts on her left hand. The wound across the earlobe was one and one-half inches long and about an inch deep but was not fatal. The stab wound was about four inches deep and resulted in a partial cut to the jugular vein and bleeding of the internal structures and could have been fatal. The medical examiner also found that Mother had a large area of bleeding into the left side of her brain consistent with a hemorrhagic stroke which could have been the consequence of her high blood pressure coupled with some kind of fight/flight response. This hemorrhage coupled with the stab wound caused Mother's death. The medical examiner opined that the butcher knife could have caused Mother's injuries and the injuries were consistent with the assailant facing Mother and Mother was lying down or standing.

Hernane was not found in the bedroom with Mother but was found later that morning, sleeping on a concrete slab near

the back door of a nearby gym. Blood stains on Hernane's shirt and shorts were tested; Mother was a "major contributor" to the DNA profiles of five of the six samples; Mother was the "single source" of the remaining sample.

While the circumstantial evidence that Hernane stabbed Mother is strong, it cannot be said that evidence of his intent is equally so. Multiple wounds were inflicted, but only one was fatal; most were superficial. One witness testified that he heard an argument, but he could not determine with any certainty where the voices were coming from nor what was said. The strongest evidence of intent was in the fact that Hernane retrieved the butcher knife from the kitchen and took it upstairs to the bedroom which was indicative of advance planning. However, there was no evidence of when the knife was taken from the kitchen, thus weakening the nexus. As the DPA's argument was directed to this weakest part of the case, we conclude that this factor is at most neutral, if not in Hernane's favor.

Weighing all three factors, the first two weigh heavily in Hernane's favor and the third is either neutral or slightly in Hernane's favor. Thus we cannot conclude the DPA's prosecutorial misconduct was harmless beyond a reasonable doubt. Hernane's second asserted point of error is therefore meritorious. The remedy for improper argument is the granting of a new trial.[8] Carvalho, 106 Hawai'i at 16 n.7, 100 P.3d at 610 n.7.

C.    DPA's Comments on Jury Deliberations.

The DPA stated the following in regard to reaching a unanimous verdict:

> Now, let's go into the facts to see how the evidence proves the defendant's guilty. Both the acts occurred and the state of mind in which he acted was present. One other thing. When you consider if the defendant acted recklessly and consider Manslaughter, consider this instruction as well. It is only if you, as jurors, collectively find the defendant not guilty of Murder in the Second Degree. In other words, you don't believe that he acted intentionally or knowingly, or if you're unable to reach a unanimous verdict, then you consider Manslaughter, only then. But I ask you before you consider Manslaughter, you know, it's easy to go in there and say, well, you know, maybe you're split between Murder and Manslaughter, and you say, you know what, let's just compromise, let's just consider manslaughter, then we can get a unanimous verdict and we can

---

[8]    Hernane does not argue that the prosecutorial misconduct warrants a reversal of the judgment and we agree.

get out of here. Please seriously consider the evidence and really with respect to the state of mind. Consider that before you -- before you just say, you know what? We will -- we're unable to reach a unanimous verdict as to Murder. It may be 11-1 in favor of Murder, but please deliberate with an eye to reaching a unanimous verdict as long as it doesn't violate your conscience, but work towards that goal.

Hernane did not object to this argument.

Hernane argues that the DPA committed prosecutorial misconduct when he admonished the jury "that it should continue deliberating until it reached a unanimous verdict[.]" Hernane asserts that the DPA's admonishment amounted to an "Allen charge."

The Supreme Court of Hawai'i has declared that "Allen charges" are impermissible in Hawai'i. An "Allen charge" is an instruction by the court to deadlocked jurors, encouraging the minority to reasonably reconsider their position.[9] In Hawai'i, Allen charges have been disapproved since 1985. State v. Fajardo, 67 Haw. 593, 601, 699 P.2d 20, 25 (1985).

DPA's comments here did not amount to an "Allen charge." First, the jury was not deadlocked. See State v. Matavale, 115 Hawai'i 149, 170, 166 P.3d 322, 343 (2007) (discussing "Allen charges" arising solely in the context of a deadlocked jury). Second, the Circuit Court did not deliver the offending comment. See Fajardo, 67 Haw. at 600, 699 P.2d at 24 ("Whether or not a case must be retried is not something that a jury should consider in its deliberations. It is error for a trial court to comment on the possible effects of a hung jury.")

---

[9] The Supreme Court of the United States summarized the lower court's instruction to the jury,

that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, unon [sic] the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

Allen v. United States, 164 U.S. 492, 501 (1896).

(Emphasis added.)  Third, the offending comment was not aimed at presently dissenting or minority jurors.

Read in context, the DPA's comment was at worst a plea to convict on the primary charge.  The DPA qualified his argument with "as long as it doesn't violate your conscience" and referenced the Circuit Court's instruction previously read.[10] The nature of the State's comment was not improper and did not constitute misconduct.

Hernane's third asserted point of error is without merit.

III.

Therefore, we vacate the October 22, 2013 judgment of the Circuit Court of the First Circuit and remand for a new trial.

DATED:  Honolulu, Hawai'i, November 30, 2015.

On the briefs:

Jon N. Ikenaga,
Deputy Public Defender,
for Defendant-Appellant.

Presiding Judge

James M. Anderson,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Associate Judge

Associate Judge

---

[10] The Circuit Court instructed the jury on this subject as follows:

> Each of you must decide the case for yourself, but it is your duty to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violating your individual judgment. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest belief as to the weight or effect of evidence for the mere purpose of returning a verdict.

> . . . .

> If and only if you find the defendant not guilty of Murder in the Second Degree, or you are unable to reach a unanimous verdict as to this offense, then you must consider whether the defendant is guilty or not guilty of the included offense of Manslaughter.